FILED

JAN 0 8 2019

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY_____
_____ DEP CLK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
No. 5:19-MJ-01036-BO

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS, | MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE NORTH CAROLINA STATE BOARD OF ELECTIONS TO QUASH RESPONDENT'S SUPBOENA UNDER FED. R. CRIM. P. 17(C) |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ......................................................................... 1

NATURE OF THE CASE ............................................................... 2

STATEMENT OF FACTS .............................................................. 2

    1.     The State Board Subpoena ............................................... 2

    2.     The County Board Subpoenas .......................................... 3

    3.     The Production Burden to the State Board and the County Boards ........... 4

    4.     Attempts to Confer on the Scope of the Subpoenas ...................... 6

ARGUMENT ............................................................................. 6

    I.     Legal Standard ............................................................ 7

    II.     The Subpoenas Are Unreasonable and Oppressive ...................... 9

        A.     The Subpoenas Are Excessively Broad and Seek Records
             That Are Irrelevant to the Grand Jury's Inquiry ...................... 9

        B.     The Subpoenas Unduly Burdens the Boards of Elections ............. 11

        C.     The Subpoenas Threaten Important Constitutional Interests .......... 13

             1.     The Subpoenas Threaten First Amendment
                    Interests of North Carolina Voters ...................... 14

             2.     The Subpoenas Fail to Respect the State's
                    Tenth Amendment Interests ............................... 16

        D.     The Subpoenas Should Be Quashed in Their Entirety ................. 18

CONCLUSION ........................................................................... 18

i

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Clapper,*
    785 F.3d 787 (2d Cir. 2015) ................................................................. 9, 10

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ........................................................................ 7, 8

*Fed. Trade Comm'n v. Am. Tobacco Co.,*
    264 U.S. 298 (1924) ........................................................................ 7, 8

*Grand Jury Subpoena v. Kitzhaber,*
    828 F.3d 1083 (9th Cir. 2016) ...................................................... 8, 9, 10

*Greidinger v. Davis,*
    988 F.2d 1344 (4th Cir. 1993) ............................................................. 15

*Harper v. Virginia Bd. of Elections,*
    383 U.S. 663 (1996) ........................................................................ 15

*In re Grand Jury 87-3 Subpoena Duces Tecum,*
    955 F.2d 229 (4th Cir. 1992) ............................................................. 13

*In re Grand Jury Investigation,*
    746 F. Supp. 866 (E.D. Wis. 1990) ..................................................... 13

*In re Grand Jury Matters,*
    751 F.2d 13 (1st Cir. 1984) ................................................................. 7

*In re Grand Jury Proceedings,*
    486 F.2d 85 (3d Cir. 1973) ................................................................. 7

*In re Grand Jury Subpoena,*
    825 F.2d 1291 (4th Cir. 1987) ............................................................. 14

*In re Grand Jury Subpoena (Amazon.com),*
    246 F.R.D. 570 (W.D. Wisc. 2007) ..................................................... 14

*In re Grand Jury Subpoena Duces Tecum Dated November 15, 1993*
    846 F. Supp. 11 (S.D.N.Y. 1994) ....................................................... 18

*In re Johnson & Johnson,*
    1959 U.S. Dist. LEXIS 3991 (S.D.N.Y. Dec. 22, 1959) ........................ 13

ii

*In re Special April 1977 Grand Jury,*
    581 F.2d 589 (7th Cir. 1978) ………………………………………….. 8, 14, 16

*Kusper v. Pontikes,*
    414 U.S. 51 (1973) …………………………………..………………….... 14

*Margoles v. United States,*
    402 F.2d 450 (7th Cir. 1968) ………………………………………………… 11

*N.C. State Conference of the NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ………………………………..………………… 15, 16

*New York v. United States,*
    505 U.S. 144 (1992) …………………………………..……………………...... 16

*Norman v. Reed,*
    502 U.S. 279 (1992) …………………………………..………………………...... 14

*Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.,*
    2006 U.S. Dist. LEXIS 82560 (S.D. Ohio Nov. 13, 2006) ………………………… 13

*Or. v. Mitchell,*
    400 U.S. 112 (1970) …………………………………………………...………… 16

*Printz v. United States,*
    521 U.S. 898 (1997) …………………………………..……………………….... 16, 17

*Storer v. Brown,*
    415 U.S. 724 (1974) …………………………………..………………………… 14

*United States v. Calandra,*
    414 U.S. 338 (1974) …………………………………………………………...... 7

*United States v. R. Enters.,*
    498 U.S. 292 (1991) …………………………………………………………….. 7, 8, 9, 11

*United States v. Richardson,*
    607 F.3d 357 (4th Cir. 2010) ………………………………..………………………...... 7

*United States v. Under Seal (In re Grand Jury Doe No. G.J. 2005-2),*
    478 F.3d 581 (4th Cir. 2007) …………………………………………………….…...... 2, 8

*Wesberry v. Sanders,*
    376 U.S. 1 (1976) ………………………………..……………………………… 14

**Statutes**

iii

N.C. Gen. Stat. § 163A-741 ................................................................................. 6

N.C. Gen. Stat. § 163A-745 ................................................................................. 6

**Rules**

Fed. R. Crim. P. 17(c)(2) ................................................................................. 7

## INTRODUCTION

State and federal officials must work together cooperatively to fulfill their vitally important roles in ensuring the integrity and security of elections. They must make sure not only that unauthorized individuals are not allowed to vote, but also that authorized voters are not impeded from casting their ballots, and that their ballots are secure and properly counted.

This Motion is brought to protect the ability of the State of North Carolina, through the State Board and county boards of elections, to focus their resources on the important tasks of ensuring secure and fair elections, rather than on wasteful and harmful diversions.

The federal government has issued more than 40 grand jury subpoenas ("Subpoenas") to North Carolina state agencies, seeking the voting records of millions of North Carolina voters. If enforced, the Subpoenas will require the State to expend an extraordinary amount of resources, while yielding vast quantities of irrelevant information and producing little, if anything, of investigative value. This request is unprecedented; for the first time in our State's history, the federal government has demanded the voting records, voter registration, and, in some cases, ballots, of every single voter in North Carolina.

The Subpoenas seek a total of approximately 15 million documents from the State Board and at least 5 million redacted ballots from the county boards of elections. Compliance with the Subpoenas would divert the State, and significant state resources, from far more productive and necessary activities, like the continuing investigation into the irregularities in absentee ballots in certain Eastern District counties, which has prevented certification of a United States House of Representatives seat from the November 2018 election.

Enforcement of the subpoenas would also open up millions of innocent North Carolina voters' records to federal criminal investigators, despite the lack of any reason to suspect that

those voters have engaged in any illegal activity. This runs the risk of chilling core First Amendment activity—registering to vote and voting—of completely innocent North Carolina citizens.

Rule 17(c) of the Federal Rules of Criminal Procedure allows federal courts to quash subpoenas in certain circumstances, including where they seek irrelevant information, are excessively broad, or unduly burdensome. *See, e.g.*, *United States v. Under Seal (In re Grand Jury Doe No. G.J. 2005-2)*, 478 F.3d 581 (4th Cir. 2007). The Subpoenas here violate all three prohibitions, and should be quashed.

## NATURE OF THE CASE

On August 31, 2018, United States Immigrations and Customs Enforcement, through the U.S. Attorney's Office for the Eastern District of North Carolina, served grand jury subpoenas on the State Board and the county boards of elections for the 44 counties in this District. The Subpoenas set a return date of September 25, which was later extended by agreement to January 14, 2019.

Pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, the State Board and the county boards of elections now file this motion to quash the grand jury subpoenas as a new action in this District.

## STATEMENT OF FACTS

**1. The State Board Subpoena**

On August 31, 2018, Immigrations and Customs Enforcement, through the U.S. Attorney's Office for the Eastern District of North Carolina, served the State Board with a grand

2

jury subpoena.[1]  The subpoena to the State Board seeks "any and all voter registration applications and/or other documents" that were "submitted to, filed by, received by, or maintained by the [Board] from January 1, 2010 through August 30, 2018."  This request covers the registration information for every single North Carolina voter who registered over the course of nine election cycles.  Declaration of K. Strach, ¶ 6.  The subpoena also demands the following specific categories of voting forms:

- standard voter registration application forms;

- federal post card applications;

- federal write-in-absentee ballots;

- one-stop (early voting) application forms;

- provisional voting forms;

- absentee ballot request forms;

- "Admission or Denial of Non-Citizen Return Forms"; and

- "Voter Registration Cancellation" or "Voter Revocation" forms. *Id.*

## 2.  The County Board Subpoenas

At or about the same time the State Board subpoena was sent, the Federal Government also sent grand jury subpoenas to each of the 44 county boards of elections within the Eastern District of North Carolina.  *Id.*, ¶ 15.  While the subpoenas were all identical and dated August 31, many counties were not served right away.  Some have been served since, while others

---

[1]      For ease of reference, this brief will refer to the subpoena to the State Board as the "State Board Subpoena" and to the identical subpoenas sent to each of the 44 county boards of elections as the "County Board Subpoenas."

3

appear never to have been served. *Id.*, ¶ 13. These County Board Subpoenas seek the following documents from August 30, 2013 through August 30, 2018:

- all poll books;[2]

- all e-poll books (*i.e.*, electronic poll books);

- all voting records and/or voter authorization documents; and

- all executed official ballots (including absentee official ballots) in each county board's possession.

The County Board Subpoenas encompass the voter information for every single voter who has registered or has voted over six election cycles. *Id.*, ¶ 14.

### 3. The Production Burden to the State Board and the County Boards

The items requested by State Board Subpoena amount to more than 15 million documents. Strach Dec., ¶ 8. As part of this 15 million document production, the State Board would also have to individually redact and prepare for production more than 46,000 military and overseas ballots. *Id.*, ¶¶ 9, 10. To respond to the State Board Subpoena, the State Board would have to expend significant time and resources and divert funds from other priorities involving administration of elections and election security. *Id.*, ¶ 11.

The amount of information required of each of the 44 individual county boards of elections will obviously vary by county population, but the burden will be significant for all of them. More than 5 million ballots were cast in the 44 counties between 2013 and 2018 that would be responsive to the County Board Subpoenas. *Id.*, ¶ 17. In order to protect the

---

[2] A poll book is a printed list of all registered voters in that county with the name, address, party affiliation, and other identifying information about each voter. These poll books are often used by elections officials to check in voters and generate the appropriate ballots as the voters present themselves to vote.

4

confidentiality of voters' ballot choices, county board staff would have to individually redact voting choices on each of these 5 million ballots before production. *Id.*, ¶ 18.

Wake County, for example, with a population of approximately 1.07 million, estimates that it would have to produce between 1.2 and 1.5 million documents, spanning more than 2 million pages. Declaration of G. Sims, ¶ 4. Of these documents, almost 600,000 are cast ballots, which would need to be individually redacted to meet the requirements of the subpoena while avoiding violations of state law. *Id.*, ¶ 5. Wake County officials estimate that it would take five employees at least four weeks, working full-time, to copy or scan the responsive material—even before they are able to redact voter choices. *Id.*, ¶ 6. This alone is estimated to cost the county almost $250,000. *Id.*

Harnett County, with a population of approximately 132,700, estimates that it would have to produce more than 335,000 documents, many of which are multi-page ballots. Declaration of M. Jackson, ¶ 4. Officials in Harnett County estimate that it may take two employees at least 9 months, working full-time, to redact, prepare, and produce responsive material. *Id.*, ¶ 5. Harnett County officials estimate that this would cost the county approximately $200,000 to hire the required personnel and purchase or rent the required copying machines and scanners. *Id.*

This is money that the county boards of elections do not have. Sims Dec., ¶ 7, Jackson Dec., ¶ 6. To respond to the subpoenas, each county board of elections would have to divert resources from other budgetary priorities related to the administration of elections and election security. Sims Dec., ¶ 8, Jackson Dec., ¶ 7. To the extent that this funding would be insufficient, counties would be forced to seek approval to divert funds from other public safety, health, or educational priorities. Jackson Dec., ¶ 7.

**4. Attempts to Confer on the Scope of the Subpoenas**

On September 7, the State Board held a public meeting to consider the State Board Subpoena and to discuss the 44 County Board Subpoenas. After the public meeting, the State Board voted unanimously to authorize the Attorney General to seek to quash the Subpoenas on behalf of the State Board and the individual county boards of elections. In addition, the State Board voted unanimously to exercise its statutory authority to assume responsibility for responding to the subpoenas issued to the individual county boards. *Id.*; *see* N.C. Gen. Stat. §§ 163A-741, 745.

Counsel for the parties have made multiple attempts to confer regarding the scope of the Subpoenas. The Federal Government agreed to defer the response date until January 14, 2019, and the State Board agreed to take reasonable steps to ensure preservation of the subpoenaed records. Otherwise, the parties have been unable to reach agreement on modified Subpoenas.

The State Board now seeks to quash the Subpoenas on behalf of itself and the County Boards.

## ARGUMENT

The Subpoenas to the State Board and the county boards are a quintessential fishing expedition, akin to "a search through all of a corporation's records, relevant or irrelevant, in the hopes that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 305 (1924). They are unreasonable and oppressive, in violation of Rule 17(c), and should be quashed.

The Subpoenas cast an extraordinarily wide net, seeking information about every voter who has registered to vote in North Carolina in the last eight years, despite the fact that there can be no credible suggestion that a substantial proportion of these voters have violated any federal law regarding voting. Allowing the Subpoenas to be enforced would inflict an extremely heavy

administrative and financial burden on the State, through the State Board and County Boards. It would also run a serious risk of chilling law-abiding North Carolina citizens from exercising their rights to register and to vote.

## I. Legal Standard

Fed. R. Crim. P. 17(c) empowers courts to quash subpoenas—both trial and grand jury—that are unreasonable or oppressive. While grand juries should be afforded leeway in pursuing investigations, *United States v. Calandra*, 414 U.S. 338, 343 (1974), the powers of a grand jury "are not unlimited and are subject to the supervision of a judge." *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972). Because grand jury subpoenas are "almost universally instrumentalities of the United States Attorney's office," *In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir. 1973), the subpoena power has the potential to "be abused," *In re Grand Jury Matters*, 751 F.2d 13, 16 (1st Cir. 1984).

Federal courts have quashed subpoenas for being unreasonable or oppressive when they are likely to result in the production of irrelevant information, *see, e.g.*, *United States v. R. Enters.*, 498 U.S. 292, 302 (1991), are excessively broad, *see, e.g.*, *United States v. Richardson*, 607 F.3d 357, 368 (4th Cir. 2010), unduly burdensome, *see, e.g., R. Enters.*, 498 U.S. at 305 (Stevens, J., concurring), or are "arbitrary fishing expeditions," *see, e.g., id.* at 299.

The requirement that a grand jury must have a "reasonable possibility" of returning information relevant to the general subject of the investigation, *R. Enters.*, 498 U.S. at 301, exists in tandem with the requirement that the federal government "tailor the request to the investigation," to ensure that there are no "broad, identifiable categor[ies] of materials . . . [that] will [not] produce information relevant to the general subject of the grand jury's investigation." *Grand Jury Subpoena v. Kitzhaber*, 828 F.3d 1083, 1089 (9th Cir. 2016).

7

Ultimately, despite their latitude, grand juries are constrained by the "first principles of justice" that prohibit "a search through all [of a corporation's] records, relevant or irrelevant, in the hopes that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

Grand juries are also prohibited from imposing an undue logistical, administrative, or financial burden on a third party. *R. Enters.*, 498 U.S. at 305 (Stevens, J., concurring).

Courts may also quash grand jury subpoenas that "intrude[] gravely on significant interests [even] outside of the scope of a recognized privilege." *United States v. Under Seal (In re Grand Jury Doe No. G.J. 2005-2)*, 478 F.3d 581, 585 (4th Cir. 2007). For example, a grand jury subpoena may be quashed if it risks a chilling effect on First Amendment interests, *see e.g.*, *Branzburg*, 408 U.S. at 708 ("We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth."), or when it tramples on the affairs of the state, "impair[ing] the state's integrity or its ability to function effectively in a federal system," *In re Special April 1977 Grand Jury*, 581 F.2d 589, 592 (7th Cir. 1978).

## II. The Subpoenas Are Unreasonable and Oppressive.

### A. The Subpoenas Are Excessively Broad and Seek Records That Are Irrelevant to the Grand Jury's Inquiry.

The challenged Subpoenas, which seeks, among other large categories, "any and all voter registration applications" for every single voter in North Carolina over the past eight years, encompasses a staggering amount of information. The Federal Government does not—and cannot—contend that more than a miniscule portion of this information could plausibly be

8

relevant to any specific criminal investigation.[3] The voter files of millions of completely innocent North Carolina voters will be swept up in this federal criminal investigation.

As discussed above, a grand jury subpoena is not a license for a fishing expedition. *See R. Enters.*, 498 U.S. at 299; *Kitzhaber*, 828 F.3d at 1089 (federal government must "tailor the request to the investigation," to ensure that there are no "broad, identifiable categor[ies] of materials . . . [that] will [not] produce information relevant to the general subject of the grand jury's investigation.")

The Second Circuit's analysis in *ACLU v. Clapper* is instructive. 785 F.3d 787 (2d Cir. 2015). In that case, the Second Circuit invalidated a National Security Agency (NSA) program that collected from telephone carriers digital information associated with calls made by and to all Americans. *Id.* at 792. The stated purpose of the program was to conduct counterterrorism investigations. *Id.* at 815. The authorizing statute for the NSA program provided that carriers were to produce to the NSA those items which could otherwise be obtained by a grand jury subpoena. *Id.* at 795 (citing 50 U.S.C. § 1861(c)(2)(D)). Accordingly, the Second Circuit analyzed the NSA program under the same standard it uses to assess grand jury subpoenas.

In doing so, the court "compare[d] the records demanded by the particular subpoena with the subject matter of the investigation, however broadly defined." *Id.* at 812. It noted that the records sought by the program were "all-encompassing," and that the federal government's

---

3      The Federal Government has not offered specific representations about the subject matter of its inquiry, nor has the State insisted that it do so. However, the Federal Government has made several related inquiries to the State Board that suggest that it may be seeking evidence of additional instances of alleged non-citizen voting beyond the 19 indictments (out of 7 million voters) brought based on voting in the 2016 elections. There is no indication, given the request for information from 7 million voters, that the Federal Government's request in any way targets the election fraud that allegedly occurred in the 2018 elections in Bladen County, which has resulted in the State Board refusing to certify the results of the race in North Carolina's Ninth Congressional District.

9

interest in the records—conducting counterterrorism investigations—was not a sufficiently "specific defined inquiry." *Id.* Instead of conducting a targeted inquiry, the federal government attempted to collect a vast amount of information, utilize its ability to "sift through the trove of irrelevant data," and identify information that, at some point in the future, might be relevant. *Id.* The court held that such an "expansive concept of 'relevance'" was both "unprecedented and unwarranted." *Id.*

Here, likewise, the information the Federal Government seeks from the State and County Boards is all-encompassing. The Federal Government seeks complete voter files in the possession of the State and County Boards for every voter in North Carolina who has registered to vote in the last five years. Strach Dec., ¶¶ 6, 15. The request is not limited to particular individuals or geographic areas, nor does it target particular incidents.

Instead of making targeted inquiries, the Federal Government seeks to sweep in a huge volume of data, almost all of it irrelevant, in the hope of later sifting through it to identify information that might warrant further investigation. Federal courts have rejected previous attempts to create such repositories of mostly irrelevant information. *See, e.g.*, *Kitzhaber*, 828 F.3d at 1089 (quashing a grand jury subpoena that sought, among other things, all "e-mail communication over several years, with no limitation on the content, senders, or recipients of the e-mails" and because the Federal Government "did not in any manner tailor its request to relevant material"); *Margoles v. United States*, 402 F.2d 450, 451-52 (7th Cir. 1968) (quashing a subpoena for "any and all equipment logs of the FBI office in Milwaukee relating to the utilization of electronic eavesdropping equipment" that was not limited to information pertaining only to the petitioner).

### B.    The Subpoenas Unduly Burden the Boards of Elections.

A grand jury subpoena may be quashed if the "volume and location of the requested materials, [or] the mere cost in terms of time, money, and effort of responding to a dragnet subpoena" would substantially burden the respondent. *R. Enters.*, 498 U.S. at 305 (Stevens, J., concurring).

The all-encompassing, "dragnet" nature of the Subpoenas would impose extraordinary burdens on the State and County Boards. The items requested by State Board Subpoena amount to more than 15 million documents. Strach Dec., ¶ 8. As part of this 15 million document production, the State Board would also have to individually redact and prepare for production more than 46,000 military and overseas ballots. *Id.*, ¶¶ 9, 10. To respond to the State Board Subpoena, the State Board would have to expend significant time and resources and divert funds from other priorities involving administration of elections and election security. *Id.*, ¶ 11.

The amount of information required of each of the 44 individual county boards of elections will obviously vary by county population, but the burden will be significant for all of them. More than 5 million ballots were cast in the 44 counties between 2013 and 2018 that would be responsive to the County Board Subpoenas. *Id.*, ¶ 17. In order to protect the confidentiality of voters' ballot choices, county board staff would have to individually redact voting choices on each of these 5 million ballots before production. *Id.*, ¶ 17.

Wake County, for example, with a population of approximately 1.07 million, estimates that it would have to produce between 1.2 and 1.5 million documents, spanning more than 2 million pages. Declaration of G. Sims, ¶ 4. Of these documents, almost 600,000 are cast ballots, which would need to be individually redacted. *Id.*, ¶ 5. Wake County officials estimate that it would take five employees at least four weeks, working full-time, to copy or scan the responsive

material—even before they are able to redact voter choices. *Id.*, ¶ 6. This alone is estimated to cost the county almost $250,000. *Id.*

Harnett County, with a population of approximately 132,700, estimates that it would have to produce more than 335,000 documents, many of which are multi-page ballots. Jackson Dec., ¶ 4. Officials in Harnett County estimate that it may take two employees at least nine months, working full-time, to redact, prepare, and produce responsive material. *Id.*, ¶ 5. Harnett County officials estimate that this would cost the county approximately $200,000 to hire the required personnel and purchase or rent the required copying machines and scanners. *Id.*

This is money that the county boards of elections do not have. Sims Dec., ¶ 7, Jackson Dec., ¶ 6. To respond to the subpoenas, each county board of elections would have to divert resources from other budgetary priorities related to the administration of elections and election security. Sims Dec., ¶ 8, Jackson Dec., ¶ 7. To the extent that this funding would be insufficient, counties would be forced to seek approval to divert funds from other public safety, health, or educational priorities. Jackson Dec., ¶ 7.

In summary, adding the administrative and financial burden of responding to the Federal Government's Subpoenas to the State and County Boards' current duties would significantly reshape their internal operations and impose untenable strain on their budgets. Federal courts have frequently quashed subpoenas, like this one, that would place this kind of burden on subpoena recipients. *See, e.g.*, *In re Grand Jury Investigation*, 746 F. Supp. 866, 867 (E.D. Wis. 1990) (quashing subpoena that required production of four million pages and more than 9,000 linear feet of documentation); *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.*, No. 2:05-cv-0673, 2006 U.S. Dist. LEXIS 82560, at *13-14 (S.D. Ohio Nov. 13, 2006) (invalidating requests that require the Inspector General, with his small staff, to review

approximately one million pages of documents and suspend every other investigation to devote weeks of manpower to the task of reviewing each document); *In re Johnson & Johnson*, No. M. 11-188, 1959 U.S. Dist. LEXIS 3991, at \*3 (S.D.N.Y. Dec. 22, 1959) (finding unduly burdensome subpoena that demands searching the contents of 620 file drawers in excess of 2.4 million pages).

Requiring the boards to generate, review, redact (in some cases), and produce tens of millions of pages of records is unreasonably burdensome and oppressive. This is especially so given that nearly all of the materials produced would be irrelevant to any conceivable investigation. This Court should quash the Subpoenas to relieve the State and County Boards of this burden.

## C.    The Subpoenas Threaten Important Constitutional Interests.

The subpoena requests also impose significant burdens on the constitutional interests of the State and its voters. Where a grand jury subpoena implicates important constitutional interests, courts should "apply with special sensitivity," the "traditional rule that grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass." *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992) (citing *R. Enters.*, 498 U.S. at 299).

Concerns about burdens imposed on respondents are heightened where a grand jury subpoena request might have a "chilling effect" on First Amendment activities. *In re Grand Jury Subpoena*, 829 F.2d 1291, 1296 (4th Cir. 1987); *see also In re Grand Jury Subpoena (Amazon.com)*, 246 F.R.D. 570, 573 (W.D. Wisc. 2007) (refusing to allow a subpoena requesting the identities of a specific group of used-book buyers because the government had failed to show a compelling interest sufficient to require "nosing through the reading lists of law-abiding citizens.").

13

In addition, significant federalism concerns exist when a Federal Government subpoena would launch a costly fishing expedition into a State's administration of matters under its purview. *In re Special April 1977 Grand Jury*, 581 F.2d 589, 592 (7th Cir. 1978).

### 1. The Subpoenas Threaten First Amendment Interests of North Carolina Voters.

The Subpoenas would require the State to turn over to the Federal Government information that voters provided to the State as a precondition to being able to vote. Enforcing the Subpoenas would have a chilling effect on voter registration and voting activity in the future, as potential registrants could be deterred by the prospect that their information would become part of an undefined criminal investigation. Much of the information sought, including social security numbers tied with voting history and party affiliation, and, in some cases, executed ballots, is confidential and personal.

The right to vote is one of the most significant constitutional interests that exists. "[N]o right is more precious in a free country." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1976). Every other right is "illusory if the right to vote is undermined." *Id.* "[S]ubstantial burdens on the right to vote or associate for political purposes are constitutionally suspect and invalid" under the First and Fourteenth Amendments "unless essential to serve a compelling state interest." *Storer v. Brown*, 415 U.S. 724, 729 (1974). When a restriction on voting is not "narrowly drawn to advance a state interest of compelling importance," it must be struck down. *Norman v. Reed*, 502 U.S. 279, 288-89 (1992); *see, e.g.*, *Kusper v. Pontikes*, 414 U.S. 51, 60-61 (1973) (invalidating statute that required a voter to be registered with a particular party for 23 months before being permitted to vote in that party's primary); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966) (striking down a $1.50 poll-tax requirement); *N.C. State Conference of the*

14

*NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016) (invalidating statutory photo ID requirement for voters).

In *Greidinger v. Davis*, the Fourth Circuit struck down a Virginia statute that required public disclosure of the voter's social security number, ostensibly to prevent voter fraud. 988 F.2d 1344, 1352 (4th Cir. 1993). While noting that "the disclosure of a SSN to the general public is a rather subtle price to pay to exercise the right to vote," the Fourth Circuit held that such disclosure of private information was "nothing short of a condition on the exercise of that right." *Id.* Thus, even in the face of the substantial state interest in preventing voter fraud, Virginia's SSN requirement was too burdensome a precondition to voting and was unconstitutional. *Id.* at 1354-55.

If the Subpoenas here were enforced, many voters would likely be justifiably concerned about the disclosure of their personal information to Federal Government law enforcement officials. Currently, prospective voters must submit a registration application that confirms the voter's name, address, and birthdate, as well as social security number or driver's license number. This voter registration application is a precondition to voting.

If the Subpoenas were enforced, it would create an additional requirement—*i.e.*, that voters would not only have to submit application forms containing certain personal information to the State, but that they do so knowing that it could be turned over directly to federal law enforcement authorities as part of an undefined criminal investigation.

North Carolina voters generally know and understand that, as a condition to voting, they must submit voter registration information to the State Board. Currently, however, there is no expectation that this information is subject to being transferred wholesale to Federal criminal investigators. There is a significant risk that the specter of their information being given to

15

Federal law enforcement might cause completely innocent North Carolinians to be afraid of voting. In a state that has battled a "long history of race discrimination generally and race-based vote suppression in particular," *N.C. State Conference of the NAACP*, 831 F.3d at 223, the risk of such a chilling effect is amplified.

In short, there is no compelling governmental interest in turning over millions of voter registration applications of innocent North Carolinians, who are not suspected of any wrongdoing, to federal criminal investigators.

### 2. The Subpoenas Fail to Respect the State's Tenth Amendment Interests.

The Seventh Circuit has recognized that a grand jury's "grandiose, brazen fishing expedition," into the affairs of a state may impair the state's sovereign interests and ability to function effectively in a federal system. *In re Special April 1977 Grand Jury*, 581 F.2d 589, 592 (7th Cir. 1978). Here, enforcement of the Subpoenas would allow the United States Attorneys' Office, in effect, to conscript state officials into the service of their ongoing investigative activities. This amounts to federal commandeering of state officials.

The federal government cannot compel the States to enact or administer a regulatory program. *New York v. United States*, 505 U.S. 144, 188 (1992). Among other problems, "forcing state governments to absorb the financial burden of implementing a federal regulatory program," would allow the federal government to avoid the financial burdens placed on the states. *Printz v. United States*, 521 U.S. 898, 930 (1997).

The Supreme Court's reluctance to allow the federal government to divert the work of many state and local officials and free-ride using state resources resonates here. The State of North Carolina invests $6.68 million annually into ensuring that the State Board can make voter registration available, adequate, and reliable. Strach Dec., ¶ 12. The State Board coordinates

16

with each of the 100 county boards of elections and the State's DMV and Department of Health and Human Services to ensure that voters are able to register to vote. *Id.*, ¶ 12. In addition, the State Board performs routine voter list maintenance to reduce the chance of registration confusion, the potential for voter fraud, and increase access to the ballot box. *Id.*, ¶ 12.

Similarly, the annual budgets of each of the county boards of elections are used by each county to train volunteers, proof and print ballots, and secure the infrastructure necessary to administer elections effectively. *Id.*, ¶ 12.

By subpoenaing all of the voter registration information in the State Board's possession, the Federal Government is attempting to free-ride on the substantial time and resources that the State has devoted to administering elections effectively. This is much like the commandeering of state assets that the Supreme Court sought to discourage in *Printz*.

The fact that the Federal Government would require the production of the State's voter information by subpoena rather than by statute does not immunize it. Under *Prinz*, the Federal Government could not require North Carolina, by statute, to administer elections by amassing information about voters, including their names, birth dates, addresses, driver's license numbers, social security numbers, and party affiliation, and then transmitting that information to the Federal Government. *See, e.g.*, *Printz*, 521 U.S. at 933 (holding that the Tenth Amendment prohibited the Federal Government from requiring local law enforcement officers to perform background checks on gunowners and supply that information to the Federal Government to create a federal database against which compliance with background check laws could be measured).

North Carolinians do not otherwise provide information from their voter registration forms to federal law enforcement officers. The method of voter registration and the manner in

17

which elections are administered are State functions. *See Or. v. Mitchell*, 400 U.S. 112, 124-25 (1970) ("the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections."). The rules governing voter registration and election administration are found within the laws of the State of North Carolina. The fact that North Carolina has chosen to collect that information, using its own resources, does not provide grounds for Federal law enforcement officials simply to take the benefits of it for themselves.

### D.     The Subpoenas Should Be Quashed in Their Entirety.

Where a subpoena "unnecessarily demands documents that are irrelevant to the grand jury inquiry" and the court "does not have sufficient information to identify relevant documents . . . and modify the subpoena," the subpoena must be quashed in its entirety. *In re Grand Jury Subpoena Duces Tecum Dated November 15, 1993*, 846 F. Supp. 11, 13-14 (S.D.N.Y. 1994).

Here, the Federal Government does not and cannot contend that more than a miniscule portion of the records sought through the Subpoenas might be relevant to a specific criminal investigation, and has not provided any basis for determining which, if any, of the millions of records actually might be relevant. Accordingly, the Subpoenas should be quashed in their entirety.

### CONCLUSION

For the foregoing reasons, the subpoena should be quashed under Rule 17(c)(2).

This 8th day of January, 2018.

Respectfully submitted,

JOSHUA H. STEIN

18

ATTORNEY GENERAL

Benjamin O. Zellinger
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Tel: (919) 716-6400
Fax: (919) 716-6763
Bzellinger@ncdoj.gov

*Counsel for the North Carolina State Board of Elections*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

Civil Action No. _____

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS, | DECLARATION OF KIM WESTBROOK STRACH IN SUPPORT OF THE MOTION OF THE NORTH CAROLINA STATE BOARD OF ELECTIONS TO QUASH RESPONDENT'S SUBPOENAS UNDER FED. R. CRIM. P. 17(C) |

**NOW COMES** Kim Westbrook Strach, who under penalty of perjury states as follows:

1. I am over 18 years of age, legally competent to give this declaration and have personal knowledge of the facts set forth in it.

2. I am the Executive Director of the North Carolina State Board of Elections ("State Board"). The State Board has general supervision over primaries and elections in the State, including ensuring compliance by the 100 county boards of elections. I have served as the Executive Director of this body and its predecessors since May 2013 and in other capacities since 2000.

3. As Executive Director of the State Board, my statutory duties include staffing, administration, and execution of the Board's decisions and orders. In addition, as Executive Director, I provide guidance to the directors of the county boards of elections. I am also the chief State elections official, responsible for coordinating compliance with the National Voter Registration Act of 1993.

4. As Executive Director and chief State elections official, I am familiar with the procedures for registration and voting in this State. I am familiar with records retention policies and the processes by which information is obtained and stored within the Statewide Elections Information Management System ("SEIMS").

5. Assistant United States Attorney Sebastian Kielmanovich, of the U.S. Attorney's Office for the Eastern District of North Carolina, indicated to staff he faxed the State Board a copy of a grand jury subpoena ("State Board Subpoena") after close of business on Friday, August 31, 2018. Following a telephone conversation with Assistant United States Attorney Kielmanovich on the next business day, Tuesday, September 4, 2018, agency counsel became aware of the purported fax but were unable to locate or confirm receipt of it. A digital copy of the subpoena was received by email on September 4, 2018.

6. The State Board Subpoena seeks production of the following:

Any and all voter registration applications and/or other documents, as identified below, that were submitted to, filed by, received by, or maintained by the North Carolina State Board of Elections from January 1, 2010, through August 30, 2018, within any of the counties in North Carolina. To include, but not limited to:

1. Standard Voter Registration Application forms
2. Federal Post Card Applications (FPCA)
3. Federal Write-In-Absentee Ballots (FWAB)
4. One-Stop (Early Voting) applications forms
5. Provisional Voting forms
6. N.C. Absentee Ballot Request forms
7. Any and all "Admission or Denial of Non-Citizen Return Form" that were generated by the North Carolina State Board of Elections, or were caused to be generated by the North Carolina Board of Elections [stet], and/or the Ethics Enforcement Office [stet].
8. Any and all Voter Registration Cancellation or Voter Revocation forms that have been generated by the North Carolina State Board of Elections, and/or the Ethics Enforcement Office [stet].

A true and correct copy is attached as Exhibit 1.

7. The State Board Subpoena requests the registration information of every North Carolina registered voter over the course of nine election cycles.

8. The State Board Subpoena does not define "voter registration applications and/or other documents." If taken to mean all documents associated with a voter's registration record in SEIMS, the response to the State Board Subpoena would require the production of more than 15 million documents and images stored within SEIMS, including but not limited to voter registration applications, changes to voter registrations, and absentee ballot requests.

9. The production required of the State Board would also include some ballots cast by military and overseas voters over the last nine years and would display the candidate selections of these voters over the years. Records within SEIMS indicate that 46,619 ballots were cast by military and overseas voters between January 1, 2010, and August 31, 2018. The State Board received and retains a currently unknown number of these ballots by email or fax.

10. Under N.C. Gen. Stat. § 163A-1105(e), voted ballots and electronic records of voted ballots are confidential and may not be disclosed to a person other than an elections official without a court order. Under N.C. Gen. Stat. § 163A-1388(b), is a Class 1 misdemeanor to disclose how an individual voted his or her ballot. The United States later requested that each voted ballot be redacted to conceal the voter's individual selections in a manner that preserves confidentiality. However, this effort would still require the State Board to redact an unknown subset of the overseas and military ballots in its possession before production.

11. If the State Board were ordered to collect, review, redact where necessary, and produce the documents responsive to the State Board Subpoena, it would require the agency to divert funds and/or substantial staff time from other agency priorities.

12. The State Board of Elections' annual budget of approximately $6.68 million funds the administration of election processes and campaign finance compliance. The State Board coordinates with each of the 100 county boards of elections and other state agencies, including the Division of Motor Vehicles and Department of Health and Human Services, to ensure voter registration opportunities are available at agencies across the State as prescribed by federal law. In addition, the State Board performs routine voter list maintenance to increase the accuracy of the voter rolls and to reduce the chance of registration confusion and the potential for fraud. County boards of elections perform numerous functions related to voter registration and list maintenance funded by their respective county governments.

13. The State Board cannot respond to the State Board Subpoena without diverting resources from current efforts to ensure election integrity and the uniform application of election law and processes. State Board staff are currently engaged in two all-consuming matters: an investigation into election irregularities affecting Congressional District 9 and the implementation of a constitutional and statutory mandate to require photo identification in elections beginning this year. North Carolina's 9th Congressional District is at present the only congressional district without a seated member, and the State Board's investigation and hearing, to take place after State Board members are appointed on or around January 31, seeks to determine whether to certify a winner or order a new election. The rollout of photo ID legislation requires among other things that the State Board to adopt rules, train the 100 county boards of elections to ensure uniform implementation, and educate the public on the new requirements in advance of municipal elections beginning in September 2019.

14. Upon information or belief, on or around August 31, 2018, after close of business, Assistant United States Attorney Sebastian Kielmanovich, of the U.S. Attorney's Office for the

Eastern District of North Carolina, faxed identical copies of a grand jury subpoena to the counties within the Eastern District (County Board Subpoenas).

15.     The County Board Subpoenas seek production of the following:

Any and all poll books, e-poll books, voting records, and/or voter authorization documents, and executed official ballots (including absentee official ballots), that were submitted to, filed by, received by, and/or maintained by the [name of county] County Board of Elections from August 30, 2013 through August 30, 2018.

16.     The response to the County Board Subpoenas would require the production of millions of records stored at each of the county boards of elections, including but not limited to voting records, individual ballots, and poll books. The number of documents and images to be produced by each county board of election will vary by population, but the burden remains significant for most of the counties.

17.     The production required of the county boards would also include cast ballots over the last five years, which would display the candidate selections of these voters over the years. In total, more than 2 million ballots were cast by voters in the 44 counties in federal elections between November 2016 and June 2018. The records retention schedule is 22 months for federal elections. Upon information and belief, counties may have retained municipal ballots and additional federal election ballots in excess of the required retention schedule which may total as many as 5 million ballots within the subpoena timeframe.

18.     The United States' request that each voted ballot be redacted to conceal how each individual voter voted preserves the confidentiality of the individual voter's choices, but it would still require the county boards to individually redact, before production, each of the ballots retained by the county boards of elections. Paper ballots are not routinely digitized and redaction efforts would require substantial logistical coordination and administrative resources.

19.     The administrative staff resources of the county boards vary.  Many of the targeted county boards of elections maintain a small staff of just 2-5 people.  Temporary and part-time staff are hired for individual election cycles.  Budgets for the county boards, including temporary workers, are generally established on an annual basis.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of January, 2019.

Kim Westbrook Strach
Executive Director
North Carolina State Board of Elections

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the
Eastern District of North Carolina

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To: Custodian of Records
North Carolina Board of Elections

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

REQUEST FOR DOCUMENTS ONLY

| Place: U.S. District Court, EDNC<br>Lennon Federal Building<br>2 Princess Street<br>Wilmington, NC 28401 | Date and Time:<br>September 25, 2018 at 8:00am |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

**** PLEASE SEE ATTACHMENT ****

Date: August 31, 2018

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

Sebastian Kielmanovich, AUSA
U.S. Attorney's Office, EDNC
310 New Bern Ave., Suite 800
Raleigh, North Carolina 27601
(919) 856-4530

USAO # 2017R00240(2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)*

was received by me on *(date)*

☐ I served the subpoena by delivering a copy to the named person as follows:

on *(date)* ; or

☐ I returned the subpoena unexecuted because:

I declare under penalty of perjury that this information is true.

Date:

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc:

**ATTACHMENT TO SUBPOENA ISSUED TO:**

**CUSTODIAN OF RECORDS, NORTH CAROLINA BOARD OF ELECTIONS**

DOCUMENTS REQUESTED:

Any and all voter registration applications and/or other documents, as identified below, that were submitted to, filed by, received by, or maintained by the North Carolina State Board of Elections from January 1, 2010, through August 30, 2018, within any of the counties in North Carolina. To include, but not limited to:

1. Standard Voter Registration Application forms
2. Federal Post Card Applications (FPCA)
3. Federal Write-In-Absentee Ballots (FWAB)
4. One-Stop (Early Voting) application forms
5. Provisional Voting forms
6. N.C. Absentee Ballot Request forms
7. Any and all "Admission or Denial of Non-Citizen Return Form" that were generated by the North Carolina State Board of Elections, or were caused to be generated by the North Carolina Board of Elections, and/or the Ethics Enforcement Office.
8. Any and all Voter Registration Cancellation or Voter Revocation forms that have been generated by the North Carolina State Board of Elections, and/or the Ethics Enforcement Office.

## INSTRUCTIONS FOR SUBMITTING GRAND JURY DOCUMENTS

## **UNLESS OTHERWISE REQUESTED, ALL FINANCIAL RECORD REQUESTS SHOULD BE DELIVERED IN ELECTRONIC FORMAT**

IN LIEU OF PERSONAL APPEARANCE BEFORE THE GRAND JURY TO DELIVER THE DOCUMENTS, YOU MAY COMPLY WITH THE TERMS OF THE GRAND JURY SUBPOENA THE FOLLOWING SHIPPING PROCEDURES:

1. Mail Electronic Media: Electronic media (DVDs, CDs, flash drives, etc.) may be physically mailed to the address identified on the subpoena. The mailed media must be packaged securely by sending either 1) by a dedicated courier such as FedEx, UPS, etc., or 2) standard U.S. Postal mail. All media mailed using these this method must be shipped using a dual-container configuration. This means media must be packaged in two nested, or double wrapped, containers; e.g., an inner envelope packed within an outer shipping envelope. The recipient's name and "To be Opened by Addressee Only" should be clearly annotated on the inner envelope. When using these mailing methods, the electronic media itself does not need to be encrypted.

> **Special Agent Jahaira Torrens**
> **HSI-ICE**
> **140 Centrewest Court**
> **Cary, NC 27513**
>
> **(919) 332-4166**

**A COPY OF THE SUBPOENA MUST BE INSERTED INSIDE THE SEALED ENVELOPE OR PACKAGE.**

When the size, weight or nature of the grand jury material precludes the use of envelopes or standard packaging, the material used for packaging shall be of sufficient strength and durability to protect the information from unauthorized or accidental disclosure. Grand Jury material may be transmitted through reliable mail and courier services only if specifically requested in paper form and properly protected by following the dual-container configuration.

OR

2. In-Person Delivery: If the documents are too voluminous to securely ship following one of the procedures above, you may release the documents requested in-person to the agent serving this subpoena upon you.

If you choose to follow either of the procedures above, it will not be necessary for anyone associated with your office to physically appear before the grand jury.



**U. S. Department of Justice**

*Robert J. Higdon, Jr.*
*United States Attorney*
*Eastern District of North Carolina*

---

*Terry Sanford Federal Building*          *Telephone (919) 856-4530*
*310 New Bern Avenue*                     *Criminal FAX (919) 856-4487*
*Suite 800*                               *Civil FAX (919) 856-4821*
*Raleigh, North Carolina 27601-1461*      *www.usdoj.gov/usao/nce*

August 31, 2018

Custodian of Records
North Carolina Board of Elections

Re: Grand Jury Subpoena No. 2017R00240(2)

Dear Sir/Madam:

You may comply with the subpoena by personally appearing before the Grand Jury or furnishing copies (originals, if specified) of the requested materials to Special Agent Jahaira Torrens prior to the grand jury date. If you choose to mail the documents, an instruction for mailing grand jury documents is attached.

We are also requesting that you complete the Business Record Affidavit pursuant to Rule 902(11) of the Federal Rules of Evidence, as amended December 1, 2000. By submitting this affidavit with the requested documents, you may avoid the need to appear at trial to testify to the authenticity of these records.

We appreciate your cooperation in this matter.

Sincerely,

ROBERT J. HIGDON, JR.
United States Attorney

SEBASTIAN KIELMANOVICH
Assistant United States Attorney
Criminal Division

Enclosures

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA

**IN RE:**                                )
                                          )     **BUSINESS RECORD AFFIDAVIT**
                                          )     **FED. R. EVID 902(11)**
**Grand Jury Subpoena**                   )
2017R00240(2)                             )

I am personally acquainted with the facts stated herein and make this statement under penalty of perjury.

I am the custodian of records for _____ (herein after referred to as "Agency"). The documents made by the Agency and produced in compliance with the subpoena <u>duces tecum</u> (consisting of _____ pages attached hereto) are memoranda, reports, records or data compilations of acts, events, conditions, opinions or diagnoses that were made at or near the time, by or from information transmitted by a person with knowledge and that have been kept in the course of the Agency's regularly conducted business activity. It has been the Agency's regular practice in that business activity to make those memoranda, reports, records or data compilations. Neither the source of information, nor the method or circumstances of preparation, indicate a lack of trustworthiness for those memoranda, reports, records or data compilations.

_____
Affiant

Sworn to and subscribed before me
this the _____ day of _____, 2018.

_____
Notary Public
My Commission expires: _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

IN RE GRAND JURY SUBPOENAS,

DECLARATION OF
GARY SIMS
IN SUPPORT OF THE MOTION OF
THE NORTH CAROLINA STATE
BOARD OF ELECTIONS TO QUASH
RESPONDENT'S SUBPOENAS
UNDER FED. R. CRIM. P. 17(C)

NOW COMES Gary Sims, who under penalty of perjury states as follows:

1.  I am over 18 years of age, legally competent to give this declaration and have personal knowledge of the facts set forth in it.

2.  I am presently the Director of the Wake County Board of Elections. In this capacity, I oversee the administration of elections in Wake County and serve as the custodian of election-related records created and received by the Wake County Board of Elections. I have held this position since July 1, 2015. Before my appointment as Director, I served as Deputy Director of the Wake County Board of Elections since September 2007. Prior to serving in Wake County, I served as the Director of Elections in Wayne County since 2003. I began my career in elections work as an Elections Investigator and Computing Consultant at the North Carolina State Board of Elections in 1999.

3.  On or around August 31, 2018, after close of business, it is my understanding that Assistant United States Attorney Sebastian Kielmanovich, of the U.S. Attorney's Office for the Eastern District of North Carolina, faxed a grand jury subpoena to the Wake County Board of

Elections (Wake County Subpoena). The Wake County Subpoena seeks the production of the following:

> Any and all poll books, e-poll books, voting records, and/or voter authorization documents, and executed official ballots (including absentee official ballots), that were submitted to, filed by, received by, and/or maintained by the Wake County Board of Elections from August 30, 2013 through August 30, 2018.

A true and correct copy is attached as Exhibit 1.

4. Wake County has a population of 1.07 million. Wake County officials estimate that it would have to produce between 1.2 and 1.5 million documents in response to the Wake County Subpoena.

5. Of these documents, Wake County officials estimate that almost 600,000 are cast ballots that would have to be redacted before production.

6. Officials in Wake County estimate that it would take five employees at least four weeks, working full-time, to copy or scan the responsive material. This does not include time that it would take to redact voter choices. This is estimated to cost the county almost $250,000.

7. Because each Wake County Board of Elections staff member is engaged, full-time, in the work of administering elections, the Wake County Board of Elections currently has no members of staff who would be able to set aside the majority of their time to devote to responding to the Wake County Subpoena. Nor does the Wake County Board of Elections have sufficient funds to allocate to hiring temporary staff members to respond to the Wake County Subpoena.

8. If Wake County were to embark on collecting, reviewing, and producing the documents responsive to the Wake County Subpoena at this time, it would require that the Wake County Board of Elections either divert funds from other priorities involving the administration

2

of elections and election security, or divert staff time that would otherwise engage in the administration of elections and election security.

9.     The Wake County Board of Elections cannot respond to the Wake County Subpoena without detrimentally affecting the ability to ensure election integrity and the uniform application of election law and processes.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of January, 2019.

Gary Sims
Director
Wake County Board of Elections

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
Civil Action No. _____

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS, | DECLARATION OF MONICA JACKSON IN SUPPORT OF THE MOTION OF THE NORTH CAROLINA STATE BOARD OF ELECTIONS TO QUASH RESPONDENT'S SUBPOENAS UNDER FED. R. CRIM. P. 17(C) |

**NOW COMES** Monica Langdon Jackson, who under penalty of perjury states as follows:

1. I am over 18 years of age, legally competent to give this declaration, and have personal knowledge of the facts set forth in it.

2. I am the Senior County Staff Attorney for County of Harnett, which position I have held since February 2, 2015. In this capacity, I represent all 25 County Departments, including the Harnett County Board of Elections. I am designated as said Board's attorney, and in that capacity, am familiar with its routine work flow, including the volume of documents the Board maintains in its ordinary course of business.

3. On or around August 31, 2018, after close of business, it is my understanding that Assistant United States Attorney Sebastian Kielmanovich, of the U.S. Attorney's Office for the Eastern District of North Carolina, faxed a grand jury subpoena to the Harnett County Board of Elections (Harnett County Subpoena). The Harnett County Subpoena seeks the production of the following:

> Any and all poll books, e-poll books, voting records, and/or voter authorization
> documents, and executed official ballots (including absentee official ballots), that were

submitted to, filed by, received by, and/or maintained by the Harnett County Board of Elections from August 30, 2013 through August 30, 2018.

4.     Harnett County has a population of 132,754 (as of 2017). Harnett County officials, including the Executive Director of the Harnett County Board of Elections, estimate that it would have to produce more than 335,000 documents in response to the County Board Subpoena.

5.     I along with the regularly-employed staff of the Harnett County Board of Elections estimate that it would take at least 4,000 man-hours, working standard 40 hour work-weeks with no breaks or vacation time, to review, redact, prepare, and produce the responsive material. Assuming the County hired two employees to work full-time on this project, it would take approximately nine months to complete this 4,000-man-hour project. The most time-consuming aspect of this exercise would encompass the manual redaction of each candidate or issue on each executed ballot to uphold ballot secrecy, as well as the redaction of many documents filled out in handwritten form by both voters and Elections Board staff. Particularly, the documents including handwritten material would require extra review and scrutiny to account for atypically completed forms caused by individuals writing outside lines and margins, including extraneous information that requires redaction, and other anomalies which result from having a standardized form being filled out by people from all walks of life. This project is estimated to cost the County approximately $200,000 to hire the required personnel and purchase or rent the required copy machines, scanners, and other equipment and supplies.

6.     Because each Harnett County Board of Elections staff member is engaged, full-time, in the work of administering elections, the Harnett County Board of Elections currently has no members of staff who would be able to set aside the majority of their time to devote to

2

responding to the Harnett County Subpoena. Nor does the Harnett County Board of Elections have sufficient funds to allocate to hiring temporary staff members to respond to the Harnett County Subpoena.

7.    If Harnett County were to embark on collecting, reviewing, and producing the documents responsive to the Harnett County Subpoena at this time, it would require that the Harnett County Board of Elections request additional budgetary funding from the Harnett County Board of Commissioners, as funds currently budgeted to the Harnett County Board of Elections cannot be diverted to other purposes without approval from the Board of Commissioners. Moreover, it would be detrimental to the mission of the Harnett County Board of Elections to divert their limited resources to projects unrelated to the administration of elections and election security, or to divert staff time that would otherwise engage in the administration of elections and election security.

8.    The Harnett County Board of Elections cannot respond to the Harnett County Subpoena without detrimentally affecting the ability to ensure election integrity and the uniform application of election law and processes.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of January, 2019.

Monica Langdon Jackson
Senior County Staff Attorney
County of Harnett
North Carolina State Bar Number 25664

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

No. _____

IN RE GRAND JURY SUBPOENAS;

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of January, 2019, I caused the foregoing Motion of the

North Carolina State Board of Elections to Quash Respondent's Subpoena Pursuant to Rule

17(c), the accompanying memorandum of law, the declarations of K. Strach, G. Sims, and M.

Jackson, and the proposed Order, to be filed with the Clerk of the Court for the United States

District Court for the Eastern District of North Carolina. I further certify that service was

accomplished on the party below via electronic email.

Sebastian Kielmanovich
U.S. Attorney's Office for the Eastern District of North Carolina
310 New Bern Avenue
Federal Building, Suite 800
Raleigh, NC 27601
Sebastian.Kielmanovich@usdoj.gov

Benjamin O. Zellinger