# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

FILED

FEB 1 5 2019

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

11:49



Nos. 5:19-MJ-1036-BO
5:19-MJ-1037-BO

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS, | MEMORANDUM OF LAW IN OPPOSITION TO THE UNITED STATES'S MOTION FOR A NON-DISCLOSURE ORDER<br><br>(**Under Seal**) |

## INTRODUCTION

Approximately two months before the 2018 midterm election, the U.S. Attorney's Office for the Eastern District of North Carolina blast-faxed, over unsecure phone lines, 46 grand jury subpoenas to public offices in counties throughout the Eastern District, to the North Carolina State Board of Elections (State Board), and to the North Carolina Division of Motor Vehicles (DMV). These subpoenas were not accompanied by a non-disclosure order, nor by any cover letter, nor by any other communication, such as a telephone call, requesting that any of the 46 recipients treat the information contained in the subpoenas confidentially. Nor did the U.S. Attorney's Office inform the recipients that the subpoenas related to an ongoing investigation on which the State Board had cooperated extensively with the office in 2017.

The subpoenas called for the production of more than 15 million documents and included requests for personal information—in some cases including executed ballots—of every single voter in North Carolina over the past eight years.

Unsurprisingly—and through no actions of the State Board, the DMV, or their attorneys—these subpoenas soon became public. They were almost immediately the subject of widespread public interest. Within hours of the U.S. Attorney's Office faxing the subpoenas to 46 offices throughout eastern North Carolina, images of the subpoenas appeared on the internet and various media outlets. In response to public concern, the State Board, in a public meeting on September 7, 2018, unanimously voted to request that the North Carolina Attorney General move on the Board's behalf to quash the subpoenas, while also ordering the 44 counties to preserve the requested items.

The widespread public interest regarding these subpoenas has continued. It has involved members of the North Carolina General Assembly, who have publicly requested updates, and has extended to the United States Senate, where the subpoenas were a topic of open discussion during the recent confirmation hearings for United States Attorney General William Barr.

During this period, the U.S. Attorney's Office has at times further stoked the public's interest, publicly discussing—in some cases, through its own press releases—aspects of its ongoing federal investigation, including the existence of the investigation into alleged non-citizen voting, the creation of a task force, and the sources and methods by which the State Board, DMV, the United States Department of Homeland Security (DHS), and the U.S. Attorney's Office identified potential non-citizen voters and registrants for investigation and prosecution.

In responding to the subpoenas and the widespread publicity and concern generated by the actions of the U.S. Attorney's Office, the State Board, DMV, and their attorneys have taken actions that are measured and appropriate. They have attempted in good faith to take account of the need to preserve confidentiality in ongoing federal investigations, while also fulfilling their

2

other legal obligations, which include properly informing the county boards of their duties regarding document preservation and compliance with the subpoenas, attempting to work with the U.S. Attorney's Office to narrow the scope of the subpoena to reduce the burden on the State and its voters, and abiding by North Carolina public records law.

As a consequence of the state entities' attempts to meet these other obligations, while also cooperating with the United States's investigation—a balance that the state agencies only had to strike because of the manner in which the United States has handled the investigation—the United States now seeks from this Court the extraordinary and unusual relief of a non-disclosure order. That order would prohibit the State Board and the DMV from disclosing any information related to the already-public 2018 grand jury subpoenas and the State Board's and DMV's responses to these subpoenas. That request should be denied.

Rule 6(e) of the Federal Rules of Criminal Procedure does not impose secrecy requirements on witnesses. On rare occasions, federal courts have entered non-disclosure orders against witnesses where there is a particularized finding of specific and compelling circumstances that would require a witness to be subject to more restrictions than other grand jury witnesses, such as bad-faith foul play to interfere with the grand jury investigation.

No such compelling circumstances even remotely exist here. And the United States' argument that a gag order is warranted relies on many factual assertions that are demonstrably incorrect.

For example:

- The United States alleges that the State Board and its counsel "continue to publicize information about the grand jury subpoenas, the investigation, and the parties' discussions about the agreed-upon production." U.S. Br. at 9. This is untrue. In fact,

3

the State Board and its attorneys have only provided information that is already
publicly available, or is directly necessary to instruct county boards of elections about
their production and preservation obligations.

- The United States claims that, in responding to still-confidential subpoenas issued in
2017, the State Board "inexplicably refuse[d] to cooperate with the federal
investigation," (U.S. Br. at 3), "stonewalled federal investigators," (*id.*) or otherwise
refused to share the information that it had gathered. Those allegations are flatly
incorrect. As discussed below, there was no "stonewalling" or refusal: it was the
federal investigators who dropped the ball and failed to sign and return a
memorandum of understanding that would have allowed the State Board to provide
access to the confidential information that the United States claimed was necessary.

- The United States claims that, in preparing the audit report, the State Board, "over the
express reservations of federal agents," "wrote to all 136 non-citizen voters and
requested proof of their eligibility to vote." (U.S. Br. at 3-4). Those assertions are
also false. Federal agents, in fact, did not express reservations about the State
Board's preparation of the audit report. The memorandum of agreement between
DHS and the State Board that the State Board used *explicitly required* the State Board
to correspond with the potential non-citizen voters first for proof of their eligibility to
vote.

The United States cannot meet its burden to show that extraordinary relief is warranted
here.

The State Board and DMV respectfully request that this Court deny the United States's
motion.

4

## STATEMENT OF FACTS

The United States's brief contains numerous factual inaccuracies. To conserve the Court's time and resources, the State will limit its factual recitation to correct those inaccuracies that appear to be material to the United States's motion at this time.

### A. The 2018 Grand Jury Subpoenas

On August 31, 2018—just more than two months before the 2018 general election, the U.S. Attorney's Office blast-faxed, over unsecure phone lines, 46 grand jury subpoenas to the State Board, the DMV, and each of the 44 counties in the Eastern District. These subpoenas were not accompanied by a non-disclosure order or a request to maintain confidentiality. Declaration of K. Love (Love Dec.), ¶ 34. The U.S. Attorney's Office also did not take any steps to inform the recipients that these subpoenas related to an ongoing criminal investigation that was under seal. *Id.* The subpoenas called for the production of more than 15 million documents and included requests for personal information (including some executed ballots) of every single voter in North Carolina over the past eight years.

The explosive nature of the subpoenas, coupled with the manner by which the subpoenas were transmitted to the State Board and the county boards in the middle of state and federal election season, caused immediate public interest. As the State Board's and DMV's motions to unseal state, the content of the subpoenas became public almost immediately on the internet and other media outlets. *Id.*, ¶ 36. To be clear, and contrary to the insinuations made by the United States in its brief, neither the State Board nor the North Carolina Department of Justice disseminated these subpoenas voluntarily until after they had become public. It was only after the State Board received public records requests seeking these subpoenas that the State Board responded—as it was required to do under the North Carolina Public Records Act—because the documents were already public by that time. *Id.*

5

The same is true for the subpoena that was sent to the DMV. The United States inaccurately suggests that the DMV immediately publicized the subpoena after it had received it. In fact, the DMV subpoena became public for reasons that remain unknown to both the DMV and the North Carolina Department of Justice. The North Carolina Department of Justice first became aware of the subpoena to DMV through the press accounts detailing its contents.

The state agencies that were the recipients of the subpoenas became very concerned about the burden that producing 15 million documents would put on their respective agency resources, fewer than two months before a general election and days before Hurricane Florence hit the eastern shores of North Carolina.

The breadth and subject matter of the subpoena requests also became a matter of widespread public interest. As the State Board's and DMV's motions to unseal state, publications here in North Carolina and nationally began seeking documents from the state agencies about the United States's request. Many outlets published articles about the subject matter of the subpoenas, the state agencies' proposed response, and the impact of the response on the privacy of millions of North Carolina voters.

The subpoenas were sent approximately one week after the U.S. Attorney's Office publicized high-profile indictments of more than a dozen non-citizen voters, who were identified through this ostensibly secret investigation. *Id.*, ¶ 33 & Ex. F. A press release from the U.S. Attorney's Office, dated August 24, 2018, details the nature of the investigation into non-citizen voting, including details about whether these individuals had registered to vote while being a non-citizen, had actually voted as a non-citizen, and which elections they had voted in. *Id.* The U.S. Attorney's Office's press release specifically connected the indictments to an "investigation

6

as to voting fraud [that] is ongoing," and that it involves a newly created task force led by United States Immigration and Customs Enforcement." *Id.*

In addition to the U.S. Attorney's Office's publication of indictments and press releases flowing out of this ongoing investigation, the U.S. Attorney's Office has on numerous occasions publicly discussed aspects of the investigation that are covered by the sealed order entered in 2017. On October 10, 2018, in a plea hearing before this Court, the U.S. Attorney's Office disclosed certain methods used by the State Board and the U.S. Attorney's Office to identify and investigate potential non-citizen voters. Love Dec., ¶ 38 & Ex. G at 1, 9. The U.S. Attorney's Office divulged, in open court, that the "understanding is that . . . the Board of Elections cross-references their information with the North Carolina DMV, who also takes applications to register to vote. And based on that information, that information was then transferred to Homeland Security who conducted an investigation as to the alienage of those individuals." *Id.* at 10.

Public interest in the subpoenas has continued. The State Board, DMV, and their attorneys continue to receive public records requests and media inquiries about the scope of the subpoenas and the state agencies' proposed response. In addition, the subpoenas have also garnered the attention of the United States Senate: the subpoenas and the U.S. Attorney's Office's inquiry was a subject of the confirmation hearings of United States Attorney General William Barr. The subpoenas and the state agencies' responses have also provoked interest from North Carolina state legislators. On January 29, 2019, the legislative committee that oversees the State Board wrote a letter to the State Board and to the Attorney General of North Carolina, asking how the agency intends to respond to the subpoenas. *Id.*, ¶ 39.

7

## B. The State Board's and DMV's Management of the Response to the 2018 Grand Jury Subpoenas

The non-confidential manner in which the U.S. Attorney's Office blast-faxed the subpoenas to 46 state and local government offices throughout the Eastern District, together with the U.S. Attorney's Offices press releases and other public statements regarding its investigations and indictments, stoked public interest and concern. The State Board, DMV, and their attorneys attempted to respond through means that were measured and appropriate, factoring in both the need to preserve confidentiality in ongoing federal investigations and the need to properly inform the county boards and the public of the status of disclosure of their information, and comply with North Carolina public records laws.

Almost immediately after receiving the subpoenas, the state agencies began discussions with the U.S. Attorney's Office to attempt to narrow their scope. Eventually, the State Board and DMV moved to quash the 46 grand jury subpoenas in January 2019. After conferring with the Clerk of the Court, the motions to quash were initially not filed under seal. In accordance with the North Carolina Public Records Act, the state agencies and their counsel provided these motions to members of the public pursuant to requests. The next day, when the Clerk of the Court informed counsel for the State Board and DMV that the motions had been subsequently placed on a sealed docket, the State Board and DMV immediately took steps to claw back the motions from the public, and immediately informed the Court. At the same time, the State Board and DMV moved to unseal the motions. Contrary to the allegations made by the United States, the State Board and DMV did not provide copies of a sealed motion to the press. U.S. Br. at 8. Rather, the motions were distributed in response to public requests before they were sealed, but were immediately clawed back after they were placed on the sealed docket. To the best knowledge of the State Board, DMV, and their counsel, the motions have not been published.

8

Following the January 2019 hearing and this Court's order on production, the State Board began taking steps to ensure that the 44 county boards of elections that possess documents responsive to the 2018 grand jury subpoenas were aware of the documents that they needed to locate and produce. On February 6, 2019, State Board staff issued an official numbered memo directing the counties to continue to preserve all documents covered by the 2018 grand jury subpoenas and notified them that the State Board would be contacting each county, individually, to identify those records that needed to be produced in accordance with this Court's order. Love Dec., ¶ 41.

North Carolina law allows State Board staff to enforce sanctions against county boards that violate provisions of numbered memos. *Id.*, ¶ 42. Numbered memoranda are, therefore, the mechanism by which the State Board staff ensures the County Boards' compliance with directives. *Id.* Accordingly, State Board staff could best ensure that the 44 county boards of elections would comply with this Court's order by issuing the numbered memo. *Id.*

In the meantime, the State Board, DMV, and their attorneys made certain limited public statements, attempting to allay the concerns of the public and the county boards of elections (which are under continuing preservation and production obligations). By design, these public statements provided little specific information about the investigation. Rather, the statements largely reiterated information that was already public knowledge, or provided additional information that was necessary to ensure proper preservation and production of documents. No statements have discussed the contents of the motions to quash, the hearing, the sealed order, or the 2017 grand jury subpoena that is subject to a non-disclosure order.

9

The State Board's public statements have informed the public that its counsel are working with the U.S. Attorney's Office to agree on a production and that it expects the production to be smaller than suggested by the subpoenas that have been the subject of public discussion for almost six months. The Attorney General's Office's comments have reiterated the position that the subpoenas are overbroad, and referenced other publicly available information.

The State Board and DMV have been diligently working to finalize documents for production pursuant to the Court's order, and anticipate being able to produce documents covered by this Court's January order next week.

### C. The State Board's Identification of Potential Non-Citizen Voters Since 2013

As the United States concedes, its involvement and engagement in its investigation began in 2017. The State Board, as part of its responsibilities to maintain voter lists, has been investigating the existence of potential non-citizen registrants and voters since 2013.

In 2013, at the urging of the North Carolina General Assembly and certain federal agencies, the State Board began updating and maintaining the State's official voter rolls by improving its ability to identify non-citizens who may have registered to vote.

Pursuant to this objective, the State Board began entering into agreements with federal partners to update the information on the State's official voter rolls. *See* Love Dec., ¶ 7. One of the ways in which the State Board updated the State's voter rolls was by identifying non-citizens who should not have been registered to vote. *Id.* To identify potential non-citizen registrants, the State Board sought access to DHS's Systematic Alien Verification for Entitlements Program, which allows state agencies to verify a resident's immigration or citizenship status. *Id.*

Before the State Board was granted access to the program, however, DHS and United States Citizen and Immigration Services required the State Board to enter into a memorandum of

10

agreement that outlined the parameters of each party's conduct. *Id.*, ¶ 8 & Ex. A. The State Board entered into this agreement in September 2013.

The alien database to which DHS provided access allowed the State Board to better identify potential non-citizens who were registered to vote. *Id.*, ¶ 7. If the State Board found any potential non-citizen registrants, the memorandum of agreement required the State Board to "[c]reate standardized correspondence to request that [the] registrant provide a Naturalization Certificate or Certificate of Citizenship to complete . . . verification," and to "[p]rovide all registrants who do not verify as a citizen . . . with adequate written notice that their citizenship could not be verified and the information necessary to contact DHS-USCIS." *Id.*, ¶ 10 & Ex. A, §§ B(1)(l), (m).

The process by which the State Board would verify and confirm citizenship status with potential non-citizen registrants was also approved of by the United States Department of Justice as part of a preclearance submission under Section 5 of the Voting Rights Act. *Id.*, ¶ 11 & Ex. B at 2.

From 2013 to 2016, the State Board used the procedure outlined above to maintain the State's voter rolls. *Id.*, ¶ 13. Throughout this period, the State Board became aware in multiple instances that DHS's alien database contained a significant amount of inaccurate or out-of-date information. *Id.*, ¶ 14.

Following the 2016 general election and concerns raised about systemic hacking of the elections infrastructure in North Carolina, the State Board undertook its own post-election audit. *Id.*, ¶¶ 15-18. It was at this time that the State Board identified the approximately 700 potential non-citizen registrants, 136 of whom may have voted. *Id.*, ¶ 18. However, because the State Board's past experience had proven that DHS's alien database was inaccurate, the State Board

11

staff on February 27, 2017, requested a meeting with federal investigators at United States Immigration and Customs Enforcement to notify them of the database's inaccuracies and to inquire whether there was a more reliable resource for identifying potential non-citizen registrants. *Id.*, ¶ 20. The ICE investigators were unable to provide State Board staff with a better resource, but instead asked State Board staff to turn over the fruits of its audit investigation. *Id.*, ¶ 21.

### D. The State Board's 2016 Audit and Cooperation with the United States

The State Board was, and continues to be, ready to work collaboratively with its federal law enforcement partners to protect the integrity of elections. However, the State Board was mindful that the ICE investigators' requests from the February 27, 2017 meeting would require the disclosure of confidential information (dates of birth, driver's license numbers, Social Security numbers, and voter signatures) that the State Board was barred from disclosing under North Carolina law. *Id.*, ¶ 22; *see also* N.C. Gen. Stat. §§ 132-1.2(4), 163-82.10(a).

On April 3, 2017, to facilitate ICE's investigation while addressing the concern about legally confidential information, the State Board sent a letter to ICE Agent Jahaira Torrens and included a memorandum of agreement between ICE and the State Board that would enforce the confidentiality requirements of North Carolina law while allowing the State Board to share this confidential information with ICE investigators. Love Dec., ¶ 23 & Ex. C.

ICE failed to respond to the State Board's letter. *Id.*, ¶ 24. Neither Agent Torrens nor any other federal investigator completed the proposed memorandum of agreement, nor did they propose any amendments to the agreement. *Id.* Contrary to the false statements that the United States has made in its motion, the State Board did not "inexplicably refuse to cooperate with the federal investigation," (U.S. Br. at 3), "stonewall[] federal investigators," (*id.*) or otherwise refuse to share the information that it had gathered. Rather, it was the federal investigators who

12

appear simply to have dropped the ball, failing to sign and return the memorandum that would have allowed the State Board to provide access to the confidential information that the United States claimed was necessary.

Meanwhile, in keeping with its own mission, on April 21, 2017, the State Board issued its formal post-election audit report. Love Dec., ¶ 25 & Ex. D. In that audit, the State Board reported that it had confirmed the existence of 441 open cases of voting by suspected active felons, 41 non-citizens who had cast ballots, 24 substantiated cases of double-voting, two cases of voter impersonation, and irregularities affecting absentee by-mail voting in Bladen County. Ex. D at 2.

The United States claims that, in preparing the audit report, the State Board, "over the express reservations of federal agents," "wrote to all 136 non-citizen voters and requested proof of their eligibility to vote." (U.S. Br. at 3-4).

That assertion is incorrect. In direct conversations with State Board staff, federal agents did not, in fact, express reservations to State Board staff about the State Board's preparation of the audit report. In fact, the memorandum of agreement between DHS and the State Board that the State Board used to identify these suspected non-citizen voters *explicitly required* the State Board to correspond with them first, to attempt to obtain proof of their eligibility to vote. Love Dec., ¶ 10 & Ex. A, § B(1)(m).

### E. The United States's 2017 Grand Jury Subpoena

On May 3, 2017, instead of completing the proposed memorandum of agreement that the State Board sent ICE investigators, which would have facilitated the production of the requested information, the United States—through those same ICE investigators—chose to issue a grand jury subpoena with a non-disclosure order. *Id.*, ¶ 26. The subpoena sought voter information related to those voters whom the State Board suspected as ineligible to vote. *Id.*, ¶ 26 & Ex. E.

13

The federal investigators were not, as the United States suggests, "[u]nable to obtain the cooperation" the State Board promised and forced to "turn[] to its own investigative tools." U.S. Br. at 5. Rather, the grand jury subpoena issued to the State Board sought documents that the State Board had already made clear it was willing to share, if only these investigators had completed the proposed memorandum of agreement that would have allowed the State Board to share this information consistent with North Carolina law. Love Dec., ¶ 23.

Nevertheless, the State Board turned its efforts to complying with the 2017 subpoena. On May 9, State Board staff and the U.S. Attorney's Office began conferring on the scope of the grand jury subpoena requests and the items sought. *Id.*, ¶ 28. During a phone conversation on May 9, 2017, the U.S. Attorney's Office confirmed that the scope of the subpoena was limited to the voters who had been identified as non-citizens in the 2016 general election audit report. *Id.*, ¶ 29.

In a follow-up phone conversation on May 10, the U.S. Attorney's Office encouraged the State Board and its staff to continue conducting its investigation. *Id.*, ¶ 30. In particular, when the State Board reminded the U.S. Attorney's Office that the memorandum of understanding with DHS required the State Board to contact the individuals suspected of having voted while ineligible, the U.S. Attorney's Office expressly encouraged the State Board to continue its normal course of investigation and contact voters directly. *Id.* The U.S. Attorney's Office certainly did not ask the State Board to violate its agreement with DHS or otherwise deviate from its usual course of conduct. *Id.*

By May 22—fewer than three weeks after the State Board had received the subpoena, the State Board produced the records relevant to the 136 individuals whom the U.S. Attorney's Office had identified as targets for investigation. *Id.*, ¶ 31. This production was not "some of the

14

information [that the State Board] had promised for months." U.S. Br. at 5. Rather, pursuant to the agreement reached by the U.S. Attorney's Office on May 9, this production resolved the State Board's obligations under the 2017 grand jury subpoena.

Neither the State Board nor the North Carolina Department of Justice have disclosed the existence of the 2017 subpoena, the targets of this subpoena, or any other information covered by this subpoena to anyone who is not covered by the non-disclosure order entered in conjunction with that subpoena. Any suggestion to the contrary is false.

The State Board heard nothing more from any federal investigators about the subpoena or its audit. *Id.*, ¶ 32. Until August 31, 2018—just more than 60 days before the 2018 general election.

## ARGUMENT

### I. The United States's Motion Seeks Extraordinary Relief That Is Unwarranted.

The United States and the State Board and DMV agree on at least one thing: the relief that the United States seeks here is extraordinary.

The circumstances here do not remotely justify such an extraordinary remedy, especially in light of the harmful impact a non-disclosure order would have on the public.

#### A. The United States Cannot Meet the Burden Required for the Extraordinary the Relief it Seeks.

The United States's motion seeks relief that imposes obligations on the State Board and the DMV that go well beyond what Rule 6(e) requires, but fails to substantiate any compelling reason why such an extraordinary step is required.

The handling of grand jury matters requires a balance between the interests in grand jury secrecy with the important constitutional interests at stake for the witnesses who are summoned before the grand jury. *See Branzburg v. Hayes*, 408 U.S. 665, 690-91 (balancing secrecy

15

interests in grand jury proceedings with First Amendment interests of reporters whose ability to gather news may be affected when forced to disclose information about sources).

The invocation of grand jury interests is not "some talisman that dissolves all constitutional protections." *United States v. Dionisio*, 410 U.S. 1, 11 (1973). Indeed, as the United Statesconcedes (U.S. Br. at 14), grand juries must "operate within the limits of the First Amendment," *Branzburg*, 408 U.S. at 708; *see also Landmark Comms., Inc. v. Virginia*, 435 U.S. 829, 838 (1978) (protecting right of newspaper publisher to publish information about proceedings before a state judicial review commission).

The importance of a witness's First Amendment interests and the limit of the secrecy obligations that may be imposed by grand jury proceedings is embodied in the text of Rule 6(e) itself: "No obligation of secrecy may be imposed on any person except in accordance with" Rule 6(e). Fed. R. Crim. P. 6(e)(2)(A). The requirements of secrecy under Rule 6(e) apply to a select group of people that includes grand jurors and the attorney for the United States, but excludes witnesses. Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e) "does not impose any obligation of secrecy on witnesses" because secrecy "seems an unnecessary hardship and may lead to injustice." Fed. R. Crim. P. 6(e), Advisory Committee Notes, 1944 Note to Subdivision (e); *see also* U.S. Br. at 14. By specifically enumerating the parties upon whom secrecy obligations may be imposed, Rule 6(e) operates as an exception to the general rule that disfavors secret proceedings. *See Butterworth v. Smith*, 494 U.S. 624, 629 (1990) (describing origins of limitations to grand jury secrecy that included protecting citizens from executive overreach under English common law).

As a result of these principles, witnesses to grand jury proceedings are typically not restrained from publicly discussing the matters to which they testified or the documents they produced in connection with the grand jury inquiry. *In re Grand Jury Investigation*, 610 F.2d

16

202, 217 (5th Cir. 1980); *United States v. Radetsky*, 535 F.2d 556, 569 (10th Cir. 1976). *See also In re Grand Jury Vescovo Special Grand Jury*, 473 F. Supp. 1335, 1336 (C.D. Cal. 1979) (allowing witness freedom to disclose documentary evidence compelled by grand jury); *In re Grand Jury Summoned October 12, 1970*, 321 F. Supp. 238, 240 (N.D. Ohio 1970) (holding that the "veil of secrecy" surrounding grand jury proceedings specifically does not apply to witnesses); *In re Petition for Disclosure of Evidence*, 184 F. Supp. 38, 41-42 (E.D.V.A. 1960) (noting that witnesses may "repeat what they said in testimony before the grand jury, or otherwise relate their knowledge on the subject in inquiry"). Indeed, even "systematic[] debriefing" of grand jury witnesses is permitted under the Rule. *In re Grand Jury Proceedings*, 558 F. Supp. 532, 533 (W.D. Va. 1983).

Nevertheless, federal courts have recognized that, in some limited circumstances, "reasonable obligation[s] of secrecy on grand jury witnesses" may be imposed—as long as the United States can make a showing that overcomes the presumptions that a witness is exempted from the secrecy obligations of Rule 6(e). *In re Grand Jury Subpoena Duces Tecum*, 797 F.2d 676, 680 (8th Cir. 1986) (citing cases). This showing, however, must include "particular and compelling circumstances" that are "rare." *In re Grand Jury Proceedings*, 417 F.3d 18, 26 (1st Cir. 2005). For example, in *In re Grand Jury Proceedings*—one of the cases upon which the United States chiefly relies—the First Circuit permitted silencing a grand jury witness who "suborned perjury of a[nother] witness in a related grand jury proceeding" to ensure that the witness did not coordinate the testimony of his co-conspirators, who were also implicated in the perjury. *Id.* at 27-28. The conduct of the witness who had already demonstrated "a capacity and intention to frustrate the investigation," therefore, provided a "special need" for the court to adhere additional restrictions to the witness's ability to speak freely about the grand jury

17

investigation. *Id.* at 26. There is nothing remotely approaching that kind of circumstance here, and any suggestion to the contrary is utterly baseless.

The United States fares no better by relying on the other cases it cites. All of those cases involve orders far more narrowly tailored than the non-disclosure order sought here. In those cases, federal courts allowed disclosure of materials that were prepared and assembled independent of the grand jury proceedings (*In re Testify*, 864 F.2d 1559, 1564 (11th Cir. 1989)), allowed non-disclosure orders that only prevented witnesses from discussing events related to the grand jury proceedings with the targets of the investigation (*In re Grand Jury Subpoena Duces Tecum*, 797 F.2d 676, 680-81 (8th Cir. 1986)), or allowed a 90-day non-disclosure order where the challengers to the order were not the subpoenaed financial institutions but rather their customers (*In re Swearingen Aviation Corp.*, 486 F. Supp. 9, 11 (D. Md. 1979)).

No similar extraordinary circumstance is present here. The United States claims that the State Board has "publicly disclose[d] information that jeopardizes the grand jury inquiry," but fails to substantiate that claim U.S. Br. at 15. Indeed, the alleged facts that the United States relies on to support this proposition are inaccurate:

### 1. The United States Inaccurately Claims that the State Board Disclosed a Covert Investigation

In 2017, the State Board did not unilaterally disclose a previously covert investigation by writing to the 136 suspected non-citizen voters for proof of their eligibility to vote. U.S. Br. at 15. Rather, the State Board merely abided by the agreement it had entered into with DHS in 2013 that *explicitly required* the State Board to correspond to these suspected non-citizen voters for proof of eligibility. Far from expressing "reservations" about this, as United States now claims, federal investigators required this outreach to voters, pursuant to an earlier long-standing agreement.

18

There was no effort by the State Board to disclose any covert investigations. In fact, in May 2017, the State Board reminded the U.S. Attorney's Office of its obligation under the memorandum of agreement to continue to communicate with suspected non-citizen voters. At that time, the U.S. Attorney's Office reassured the State Board that it should continue its investigation in its usual course and should not violate its memorandum of agreement. The assertion that the State Board somehow intentionally thwarted the grand jury investigation by merely complying with its previous agreement with federal investigators is baseless.

### 2. The United States Inaccurately Claims that the State Board was More Interested in Publicity than Assisting Federal Investigators.

The second reason that the United States claims requires this Court to muzzle the State Board rings equally hollow. The United States claims that, in April 2017, the State Board publicly reported its investigative findings before providing to federal investigators any information about the data underlying its election audit report. U.S. Br. at 15-16.

That assertion is false. The information requested by federal investigators in February 2017 required the disclosure of confidential information that was protected by North Carolina law. Love Dec., ¶ 22; *see also* N.C. Gen. Stat. §§ 132-1.2(4), 163-82.10(a). As an accommodation to these federal investigators, State Board staff on February 27, 2017, sent a letter to these federal investigators that included a memorandum of agreement that would enforce the confidentiality requirements of North Carolina law while allowing the State Board to share the requested confidential information with federal authorities. For reasons unknown to the State Board, that letter went unanswered and the United States failed to complete the proposed memorandum of agreement. Indeed, the United States still has not responded to this letter or signed the agreement.

19

Nearly three weeks after that correspondence, on April 3, 2017, the State Board issued its audit report, as required under North Carolina law.

Contrary to the insinuations made by the United States, the State Board did not withhold information from the United States or otherwise refuse to cooperate with a federal investigation in favor of publicity. U.S. Br. at 3. Rather, it was the federal investigators' own failure that has caused the alleged injury it complains of now. Whatever injury the United States feels its investigation has suffered, however, is not the result of a scheme by the State Board to thwart the United States's efforts.

### 3. The United States Inaccurately Claims that the State Board's Directions to County Boards Violate This Court's Sealing Order.

The United States also claims that the State Board's issuance of a Numbered Memo that directs the county boards of elections to preserve, review, and produce documents responsive to the 2018 grand jury subpoenas is somehow a disclosure of matters discussed at the January 2019 hearing that "threaten[s] the integrity of this investigation." U.S. Br. at 16. That assertion is also belied by the facts.

The State Board issued the Numbered Memo to the county boards of elections to ensure that they would review and assist the State Board in producing, the documents covered by this Court's January order, while continuing to preserve the other items referenced in the subpoenas. Importantly, the Numbered Memo did not identify any of the individual targets, disclose any personal information about the targets, identify the number of targets in every affected county, or otherwise provide any information that would allow the targets or witnesses to destroy evidence. *Id.*, ¶ 41 & Ex. J. In fact, the Numbered Memo notified counties that they would be contacted individually to identify the records that need to be produced. *Id.*, ¶ 41 & Ex. J at 1. It is entirely unclear how a directive that ensures compliance with this Court's order and does not disclose

20

any information that would identify potential targets or witnesses frustrates the United States's investigation.

The United States also seems to suggest that the documents covered by the 2018 subpoenas reside solely with the State Board—a statement that is puzzling to the State Board. U.S. Br. at 16. The 2018 grand jury subpoenas seek, for example, pollbooks, e-pollbooks, and redacted ballots. These documents are housed almost exclusively with county boards of elections. Therefore, the State Board requires the cooperation of the county boards to produce this information.

### 4. False Statement #4: A non-disclosure order is necessary to ensure compliance by State Board and DMV.

The United States also muses that a non-disclosure order is necessary to ensure that the State Board and DMV do not disclose the names of targeted individuals, the content of the United States's requests, or the documents pursuant to them because this could "seriously impede the grand jury inquiry." U.S. Br. at 17. This idle speculation is without basis.

First, neither the State Board nor DMV have ever disclosed the names of targeted individuals related to this inquiry. Moreover, on a phone call as recently as February 8, 2019, counsel to the State Board and DMV assured the U.S. Attorney's Office that neither the State Board nor the DMV (or its lawyers) would disclose the names of targeted individuals. The U.S. Attorney's Office provides no reason to doubt this assurance.

Second, neither the State Board nor DMV could disclose the documents produced pursuant to the 2018 subpoena requests. These documents contain confidential information that North Carolina state agencies are prohibited from disclosing to the public as a matter of North Carolina law. N.C. Gen. Stat. §§ 132-1.2(4), 163-82.10(a). Even if the federal inquiry never existed, the State Board and DMV could not disclose these documents.

Third, the United States' preoccupation with secrecy related to the content of its requests is a quintessential illustration of the horse having left the barn. The United States does not dispute that the grand jury subpoenas are already matters of public record. Images of the 2018 grand jury subpoenas were posted on the internet and in news publications within hours of being faxed. In fact, counsel to the State Board and DMV were first made aware of some of these subpoenas through the media. Accordingly, neither the State Board nor DMV (or their lawyers) would have any reason to disclose the content of the United States's requests—these requests have already been disclosed by other parties. The United States's concern here is misplaced, at best.

### 5. False Statement #5: State Board personnel might tamper with or destroy evidence.

Finally, the United States gives two general and vague reasons why a non-disclosure order should issue here. Specifically, the United States claims to be concerned about the likelihood that subjects to a federal investigation will flee or that "Board personnel, board volunteers, or others" may tamper with or destroy evidence. U.S. Br. at 16-17. These concerns are overstated. Neither the State Board nor DMV has publicly identified any of the subjects of this federal investigation. And they have pledged to not do so in the future. There is no reason to believe that the State Board or DMV will now identify particular subjects when it has no history of doing so. Any concern that the United States may have about disclosure of this nature are present with any grand jury witness.

The United States's accusation that the State Board personnel will tamper with or destroy evidence, however, is false and offensive. The United States claims that its investigation implicates a "former election official" with the State Board "helped a non-citizen complete a voter registration form, but left the citizenship question unanswered." U.S. Br. at 6. There is no

22

factual basis for the United States to make this statement about a case that it is currently prosecuting. The individual who is under investigation for having helped a non-citizen register was never, in fact, a State Board or county board employee. The individual was a volunteer, and would not be subject to the non-disclosure order requested by the United States anyway. To be clear, no State Board or county board employees have been implicated in any wrongdoing by the United States in connection with this investigation. Implying otherwise is misleading.

The United States's other generalized concerns about evidence tampering also fail to support granting a non-disclosure order because these general concerns exist with any grand jury witness. *In re Russo*, 53 F.R.D. 564, 571 (C.D. Cal. 1971) (holding that generalized fear that the guilty will flee before an indictment issues, or the possibility of suborning false testimony or tampering with witnesses is insufficient to assess secrecy obligations on witnesses not bound by Rule 6(e)). The United States provides no reason to support its contention that the State Board or DMV, in particular, needs to be treated disparately. *See In re Grand Jury Subpoena*, No. 2:18-mj-00086-NJK, 2018 U.S. Dist. LEXIS 12774, at *2 (D. Nev. Jan. 25, 2018) (consolidating precedent from five circuits and holding that "non-disclosure orders will not issue as a matter of course and boilerplate recitations of need will not suffice. Instead, courts insist on a particularized showing of the need for a non-disclosure order based on the circumstances of each case.").

### B. Awarding the United States the Relief it Seeks Would Produce Serious Consequences That Threaten the Ability of State Agencies to Carry Out Their Mandates.

Beyond being unwarranted, a non-disclosure order here would create additional harm by hampering the state agencies' ability to function effectively and provide services for the residents of North Carolina.

The State Board is the agency entrusted with ensuring the administration of fair elections in North Carolina. It is tasked with preparing for elections, anticipating problems with the security and integrity of municipal, state, and federal elections, and administering elections in a manner that allows full and fair access to the vote. As part of its mission, the State Board pursues transparency and accountability to North Carolina voters.

In times where the integrity of elections is questioned, the State Board is held accountable by the public, which rightfully demands assurances about the security of its elections. The appearance that the State Board is obfuscating or hiding the truth threatens the public trust in our democracy. The non-disclosure order that the United States is now requesting requires that the State Board and its counsel frustrate the inquiries of the public when it asks the State Board for information pertaining to alleged election fraud. This inability to assure voters would create serious consequences to the public's trust in the elections process.

This concern is not theoretical. The U.S. Attorney's Office, while claiming that secrecy is paramount in this investigation, has publicized through press releases the indictment of dozens of non-citizen voters who were identified through this allegedly secret investigation. *Id.*, ¶ 33. Many media outlets have reported on these indictments, pleas, and convictions—in sufficient numbers to concern the public. The U.S. Attorney's Office's attempt to selectively publicize certain aspects of its investigation while preventing the State Board from responding to the resulting confusion and concern from voters should not be allowed by this Court.

In addition to the U.S. Attorney's Office's publication of indictments flowing out of this ongoing investigation, the U.S. Attorney's Office has also discussed on many occasions, publicly, aspects of this investigation that are covered by the sealed order entered in 2017. For example, on October 10, 2018, before this Court, the U.S. Attorney's Office disclosed the

24

manner and methods used by the State Board and the U.S. Attorney's Office to identify and investigate potential non-citizen voters. Love Dec., ¶ 38 & Ex. G at 1, 9. The U.S. Attorney's Office divulged, in open court, that his "understanding is that . . . the Board of Elections cross-references their information with the North Carolina DMV, who also takes applications to register to vote. And based on that information, that information was then transferred to Homeland Security who conducted an investigation as to the alienage of those individuals." *Id.* at 10. Where the U.S. Attorney's Office itself is so cavalier about the secrecy of the methods of its grand jury investigation, it cannot now credibly assert the State Board's and DMV's efforts to ensure that voters are not misled would somehow endanger the federal investigation so much that the Court must now issue a non-disclosure order to prevent such a danger.

## II. The United States's Motion is Inconsistent with Local Rules and Needlessly Consumes Judicial Resources.

The U.S. Attorney's Office and counsel to the State Board and DMV have been in regular contact regarding production since this Court's January order. On one such occasion, during a phone call on February 8, the U.S. Attorney's Office asked whether the State Board and DMV would be amenable to a non-disclosure order. Counsel to the State Board and DMV responded that it, in fact, might be, if narrowly and appropriately tailored, and asked the U.S. Attorney's Office to send a draft of the order that the United States contemplated for the State Board's and DMV's review. The U.S. Attorney's Office agreed, but never followed through. It simply filed this motion on the next business day.

The United States' failure to comply with Local Rule 16.1, requiring a good-faith effort to meet and confer regarding the issues raised in the motion, is sufficient grounds to deny the motion.

Had such a meet and confer occurred, the State Board and DMV would have made clear that they have no objection to an appropriately tailored non-disclosure order that would protect: (1) the identity of the 781 individuals at issue, and (2) the documents produced by the State Board and DMV associated with these 781 individuals. The State Board and DMV, however, do not feel that such a non-disclosure order is necessary because they have long since pledged to voluntarily comply with these principles.

## CONCLUSION

For the foregoing reasons, the motion of the United States for a non-disclosure order should be denied.

This 15th day in February, 2019.

Respectfully submitted,

JOSHUA H. STEIN
ATTORNEY GENERAL

Benjamin O. Zellinger
Assistant Attorney General
Bzellinger@ncdoj.gov

*Counsel for the North Carolina State Board
of Elections and the North Carolina
Division of Motor Vehicles*

North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Tel: (919) 716-6400
Fax: (919) 716-6763

26